AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| INFORMATION ASSOCIATED WITH ONE CELLULAR ACCOUNT STORED AT PREMISES CONTROLLED BY ONE PROVIDER PURSUANT TO 18 U.S.C. 2703 AND 3123 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 922(g)(1). | ) ) ) ) ) | Case No.  24-SC-1260 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year); D.C. Code §§ 22-401, 4502, 1805 (Assault With Intent To Kill While Armed and Aiding and Abetting); D.C. Code § 22-4504(b) (Possession of a Firearm During a Crime of Violence or Dangerous Offense ("PFCOV")). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

- ❐ Continued on the attached sheet.
- ❐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Thomas Jones, Detective
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Telephone _____ *(specify reliable electronic means)*.

Date:  _____6/11/2024_____

_____
*Judge's signature*

City and state:  _____Washington, D.C._____

Zia M. Faruqui
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means     ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) |
| --- | --- |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   24-SC-1260 |
| INFORMATION ASSOCIATED WITH ONE CELLULAR | ) |
| ACCOUNT STORED AT PREMISES CONTROLLED BY ONE | ) |
| PROVIDER PURSUANT TO 18 U.S.C. 2703 AND 3123 FOR | ) |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. § 922(g)(1). | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 24, 2024 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Zia M. Faruqui _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 6/11/2024 _____          _____
                                                                                                         *Judge's signature*

City and state: _____ Washington, D.C. _____          Zia M. Faruqui
                                                                                         United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br> 24-SC-1260 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:   _____

_____
                                *Executing officer's signature*

_____
                                *Printed name and title*

## ATTACHMENT A

### *Property to Be Searched*

This warrant applies to records and information associated with the VERIZON account assigned to call number (202) 961-0234 (the "**TARGET PHONE NUMBER**") which is stored at premises owned, maintained, controlled, or operated by VERIZON WIRELESS ("**PROVIDER**"), a wireless telephone service provider located at 180 Washington Valley Road. Bedminster, NJ 07921.

<u>**ATTACHMENT B**</u>

**I.    Information to Be Disclosed by PROVIDER to Facilitate Execution of the Warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of **PROVIDER**, including any records that have been deleted but are still available to the Provider or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.   The following information about the customers or subscribers of the Account:

        i.   Names (including subscriber names, user names, and screen names);

        ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.   Local and long-distance telephone connection records;

        iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service used;

        vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

        viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records;

ix.   Provide all incoming and outgoing short codes and dialed digit extractions or post cut through digits;

x.   All customer notes and memos attached to the account, means and source of payment for such service (including any credit card or bank account number) and billing records;

xi.   Device purchase information to include the Date, Time, Location, and Credit Card Information of where the device or any pre-paid refill cards were purchased including pre-paid card information. This also applies to any mobile virtual network operator holding agreements with AT&T, T-Mobile Wireless, Dish Wireless and Verizon

Shall apply to any change dialed number subsequently assigned to a device bearing the same ESN, IMSI or SIM as the target cell phone; any changed ESN, IMSI or SIM subsequently assigned the same dialed number as the target cell phone; or any additional changed dialed number, ESN, IMSI or SIM listed to the same subscriber account as the target cell phone;

xii.   Any other Wi-Fi access point MAC/wireless internet protocol/data packed transmissions, to include cell site information; and

b.   **For the time period from April 2, 2024, at 12:00 a.m. EST through April 2, 2024, at 11:59 p.m. EST**: All records and other information relating to wire and electronic communications sent or received by the Account, including:

i.   Records of the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers ("call detail records"), email addresses, and IP addresses) including web browsing history and text messaging history;

    ii.    Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; and,

    iii.    Records and information regarding per-call measurement data (PCMD) (also known as Network Event Location Services (NELOS), Timing Delay/Timing Advance (TA), TrueCall, Time on Tower Report, and/or Real Time Tool (RTT) data), and specifically including all available per-call measurement data and RTT reports, to include 1X, EVDO, LTE, IP session, and Data.

    iv.    Information about the location of the target telephone includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

    v.    All available Mobile Data Session and IPv6 reports and any other location information, including "distance to tower" information or Timing Advance Information or T-Mobile's TDOA report.

c.    All records pertaining to devices associated with the Account, including the names and phone numbers associated with other devices on the subscriber's plan, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC")

addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s).

Within 14 days of the issuance of this warrant, **PROVIDER** shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

> **Detective Thomas Jones**
> **Metropolitan Police Department**
> **Thomasm.jones@dc.gov**

This warrant authorizes a review of records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, MPD may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence, instrumentalities, fruits, and contraband of the violations of Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1); Assault With Intent To Kill While Armed and Aiding and Abetting ("AWIK w/A"), D.C. Code §§ 22-401, 4502, 1805; and Possession of a Firearm During a Crime of Violence or Dangerous Offense ("PFCOV"), D.C. Code § 22-4504(b) (the **TARGET OFFENSES**) involving **LOVER** and his co-conspirators on April 2, 2024, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a)  The possession of firearms, gun paraphernalia, and ammunition by **LOVER** and his co-conspirators;

(b)  Information that constitutes evidence of any planning and preparation that the user of the account undertook prior to committing the criminal activity under investigation;

(c)  Information that constitutes evidence of any steps that the user of the account took to disguise or hide their participation in the criminal activity under investigation;

(d)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(e)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(f) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner; and,

(g) The identity of any person(s) who communicated with the account about matters relating to the defendant and co-conspirators' Unlawful Possession of a Firearm, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, MPD may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review

### III.     Government Procedures for Warrant Execution

The United States government will conduct a search of the information produced by **PROVIDER** and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from **PROVIDER** that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE CELLULAR ACCOUNT STORED AT PREMISES CONTROLLED BY ONE PROVIDER PURSUANT TO 18 U.S.C. 2703 AND 3123 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 922(g)(1).** | **Case No. 24-SC-1260** |

*Reference: USAO Ref. # 2024R00836; Subject Account: (202) 961-0234*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Detective Thomas Jones, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for certain location and related information associated with one cellular telephone account assigned the phone number (202) 961-0234 (the "**TARGET PHONE NUMBER**"), that is stored at premises controlled by Verizon Wireless, a wireless telephone service provider located at 180 Washington Valley Road, Bedminster, NJ 07921. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require **PROVIDER** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

**AFFIANT BACKGOUND**

2.     I am an "investigative or law enforcement officer of the United States" within the

9

meaning of 18 U.S.C. § 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am cross-designated and have the authority to conduct narcotics trafficking investigations and enforcement activities pursuant to Title 21 of the United States Code.

3.     I am a detective assigned to the Seventh District of the Metropolitan Police Department ("MPD") in Washington, D.C. I have worked in law enforcement for 26 1/2 years. I have participated in numerous firearms related arrests and have participated in the execution of firearm related search warrants. I have received on-the-job training in the areas of drugs, weapons, and narcotics enforcement. I have received similar training at the Metropolitan Police Departments Training Academy. I have also been involved in numerous arrests for violations of the D.C. Code. As a police officer I have become familiar with the habits and practices of criminals who deal in the illegal possession or use of firearms. I have made and participated in over 100 criminal arrests that involved firearms related offenses. Your affiant is currently assigned to the Seventh District Detectives Unit.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Because this affidavit is being submitted for the limited purpose of seeking the search warrants specified below, I have not set forth every fact learned during the course of this investigation. Rather, I have set forth only the facts that I believe are necessary to establish the legal foundation for an order authorizing the requested warrants.

6.     Unless otherwise noted, wherever in this affidavit I assert that a statement was

made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

7.      Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

8.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Alonzo **LOVER** and his co-conspirators have committed violations of Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1); Assault With Intent To Kill While Armed and Aiding and Abetting ("AWIK w/A"), D.C. Code §§ 22-401, 4502, 1805; and Possession of a Firearm During a Crime of Violence or Dangerous Offense ("PFCOV"), D.C. Code § 22-4504(b) (the **TARGET OFFENSES**). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

9.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.

## PROBABLE CAUSE

10.      On April 2, 2024, Officer Melvin Cruz was in full uniform, operating a marked scout car located in front of 2758 Bruce Place, Southeast, Washington D.C. 20020. Officer Cruz

was facing west towards the intersection of Bruce Place and Raynolds Place, Southeast, Washington, D.C. At approximately 11:25 AM, Officer Cruz saw a black sedan and, immediately behind it, a red Kia Borrego SUV stopped in front of 2802 Bruce Place, Southeast, Washington, D.C. 20020. Officer Cruz then saw two individuals wearing dark clothes, one in the rear passenger seat and one in the front passenger seat, hanging out of the vehicle. Simultaneously, Officer Cruz saw gun smoke and heard multiple sounds of gunshots.

11.     Police officers canvassed the area for CCTV and found a camera that captured the shooting. Specifically, as shown in the still photos below, the front passenger of the red SUV (later identified as defendant **LOVER**) and the back seat passenger (later identified as co-defendant Warfield) were captured leaning out the windows of the red SUV and shooting at a gray Mercedes-Benz sedan. **LOVER** was shooting a rifle with blue markings and Warfield was wearing blue gloves and shooting a handgun.



*Figure 1: Warfield (rear passenger) and Lover (front passenger) Shooting at Complainant.*

12.     The gray Mercedes-Benz sedan was later identified as belonging to the complainant, who explained that he was driving on Morse Road, Southeast, when he noticed the red SUV following his car. When the complainant made a left onto Bruce Place, Southeast from

Fort Place, Southeast, the red SUV pulled up beside his driver's side door and began shooting into

his vehicle. The complainant's vehicle sustained one bullet hole to the rear windshield window,

two bullet holes to the passenger front window, and one bullet hole to the passenger side mirror.

13.    After the shooting, the red SUV made a right onto the 2300 block of Raynolds

Place, Southeast, Washington D.C., and Officer Cruz followed it. A minute later, at approximately

11:26 AM, Officer Cruz next saw the vehicle resting along the wood line on 22nd Street, having

traveled off the street and over the curb. Officer Cruz then immediately chased three individuals

on foot after they fled the red SUV. The location of the shooting is indicated in the map below

with a red mark and the location of the crash is indicated with a yellow x.



***Figure 2: Map of Shooting and Red SUV Crash.***

14.    In addition to Officer Cruz, two detectives witnessed the three individuals in the

red SUV as it crashed. Prince George's County Police Department ("PGPD") Detectives Michael

Stargel and Brendan Stokes were in the area for an unrelated matter and were outside of their unmarked surveillance cars in the intersection of Harford Street and Langston Place, Southeast, when they heard several gunshots near their location.

15.     Moments after he heard the gunshots, Detective Stargel saw the red SUV come down Langston Place, Southeast, at a high rate of speed and begin to lose control as it rounded the curve, almost striking Detective Stargel's vehicle. Detective Stargel observed the red SUV start sliding back and forth across Langston Place until it crashed into the wood line on 22nd Street, Southeast. Detective Stargel saw three people get out of the red SUV. The driver started walking towards 22nd Street until a marked MPD patrol vehicle pulled up, at which point he ran into the woods. Detective Stargel also saw two people get out of the passenger side of the red SUV and immediately run into the woods. One of the passengers was holding a blue rifle. Detective Stokes witnessed the same.

16.     Detective Stargel also noted that the driver was wearing a black puffy coat and both passengers who exited were armed – one of the males from the passenger side was carrying a blue AK-47-style rifle and the second male from the passenger side was manipulating a pistol. Detective Stokes saw all three men run to the bottom of the ravine near the drainage creek and continue running toward Suitland Parkway. The drainage creek is circled in red in the map below and the location of the detectives' vehicles when they observed the crash and bail out is indicated with a pink X.



**Figure 3: Position of Detectives' Vehicle and Defendants' Approximate Flight Path.**

17.     As MPD officers arrived, Detective Stokes directed incoming officers to Suitland Parkway to cut off the three men. Within six minutes of the shooting, all three men were apprehended and detained in the woods. The complainant was later taken to the crash scene in front of 3010 22nd Street, Southeast, by Detective Jones where the complainant positively identified the red Kia SUV as the vehicle from which the shots came.

18.     Detective Jones contacted Individual 1, the owner of the red SUV, and asked for Individual 1's consent to process the vehicle for evidence. Individual 1 declined Detective Jones' request.

## *Apprehension and Identification of Lover, Mullins, and Warfield*

19.     At 11:31 AM – *just six minutes after the shooting* – Defendant **LOVER** was detained by Officers Brandon Cyrus and Samuel Horst. At 12:21 PM, Detective Stokes positively identified **LOVER** during a show-up identification procedure as one of the people he saw exit the

passenger side of the red SUV. Detective Stokes said that **LOVER** was the individual armed with a blue AK-47 style rifle. In addition, **LOVER** was wearing clothing consistent with the front-seat shooter as captured in the surveillance footage (*see* Figure 4, *infra*), absent a white hat. Notably, a white hat later was found in his flight path. **LOVER** falsely identified himself to law enforcement as Marcus Adams and provided a date of birth of January 27, 1994. After his fingerprints were taken and scanned into the database at the police station, officers learned that his true name was Alonzo **LOVER**.

20.     At approximately 11:30 AM – *just five minutes after the shooting* – officers surrounded and detained co-defendant Mullins. While near the crash scene, Detective Stargel saw Mullins being brought out of the woods and positively identified Mullins as the driver of the red SUV. Mullins later provided officers his name and date of birth.

21.     Co-defendant Warfield was detained by Officer Joubert Joseph at 11:29 AM – *four minutes after the shooting*. Warfield was wearing blue surgical gloves and a black hoodie with a slanted zipper pocket on the right side, consistent with what the back-seat shooter was wearing in the drive-by shooting. *See* Figures 4-7, *infra*. Moreover, as captured on body worn camera footage, Warfield was caught removing the blue gloves and discarding them on the ground as he was detained. During a show-up identification procedure at 12:16 PM, Detective Stokes positively identified Warfield as one of the people he saw exit the passenger side of the red SUV. Warfield provided officers his name and date of birth.



*Figure 4: Warfield (rear passenger) and Lover (front passenger) Shooting at Complainant.*



*Figures 5, 6, and 7: Warfield Wearing Blue Surgical Gloves at 11:29 AM When He Was Detained.*



***Figure 8: Warfield in Black Hoodie with Right Side Zipper Pocket in Forward Slanting Direction.***

22.     After the defendants were detained, officers canvassed the woods in the defendants'

flight path and found on the ground a black Glock 19 Gen 5 semi-automatic handgun (SN#

BKRG362), with no round in the chamber and 11 rounds in a 15-round capacity magazine. The

Glock 19 Gen 5 handgun appeared to be fully functional, capable of expelling a projectile by means

of an explosive action, had a barrel length of less than 12 inches, and the ability to be fired by the

use of a single hand.



*Figure 9: Recovered Glock 19 Gen 5 semi-automatic handgun.*

23.     Officers also found a black semi-automatic Draco Norinco MAK-9 Sporter (SN# #35034) with blue tape wrapped around the barrel, 1 round in the chamber and 17 rounds in an unknown capacity magazine.



*Figure 10: Recovered Draco Norinco MAK-9 Sporter.*

24.     The rifle recovered in the woods is consistent with the rifle used by the front-seat shooter as captured in the CCTV footage of the shooting and corroborates Detective Stokes' statement that he saw **LOVER** carrying a blue rifle. S*ee* Figure 11, *infra*.



*Figure 11: Warfield (rear passenger) and Lover (front passenger) Shooting at Complainant.*

25.    While canvassing the scene of the shooting, police found 9 mm and 7.62 x 39 mm shell casings in front of 2806 Bruce Place, Southeast, which were collected as evidence. National Integrated Ballistics Information Network ("NIBIN") results indicated a potential ballistics link between both the recovered Glock 19 handgun and 9 mm casings recovered and the Draco rifle and the 7.62 x 39 mm casings recovered.

26.    A search of government records revealed that neither Mullins, Warfield, nor **LOVER** was licensed to carry a firearm or possess ammunition in the District of Columbia.

27.    Your affiant is aware that **LOVER** has been convicted of multiple crimes punishable by more than one year of incarceration. Specifically:

    a.    **LOVER** was on supervision at the time of this offense, following his July
          29, 2019 conviction for Conspiracy to Commit Robbery in C-02-CR-19-

000128 in the Maryland Circuit Court for Anne Arundel County; **LOVER** was sentenced to six years of incarceration fully suspended.

b.  In Maryland, **LOVER** was also convicted of Robbery in the Circuit Court of Montgomery County (docket number 135082C) on July 25, 2019 and sentenced to 15 years of incarceration, with 12 of those years suspended.

c.  In addition, **LOVER** was convicted of Assault with a Dangerous Weapon in the District of Columbia in Superior Court case number 2015 CF3 010264 (in which, according to the proffer of facts filed as part of his guilty plea, he pulled a firearm from his waistband and fired multiple shots at is victim); he was sentenced on October 23, 2015, to 36 months' imprisonment and three years of supervised release.

d.  In Washington, D.C., **LOVER** was convicted of Attempted Robbery in D.C. Superior Court case number 2012 CF3 008709 and sentenced under the Youth Rehabilitation Act ("YRA") (24 D.C. Code § 903(a)) on September 10, 2012, to 12 months' incarceration suspended, one year of supervised release suspended, and 18 months of supervised probation. That sentence was revoked on March 18, 2013, and he was re-sentenced to 6 months' incarceration and one year of supervised release, but without the benefit of the YRA.

28.   Having served more than a year of incarceration in multiple cases, Lover was aware at the time of this offense that he had been previously convicted of a crime punishable by more than a year.

29.     There are no firearms or ammunitions manufacturers in Washington, D.C., therefore both firearms traveled in interstate commerce.

30.     Following the defendants' arrest on April 2, 2024, all three defendants were presented to the Honorable Eric Glover in C-10 in D.C. Superior Court. After reviewing the Gerstein submitted in the case, Judge Glover found that there was insufficient probable cause for the charged offenses as it related to all three defendants. Judge Glover dismissed the case and released all three defendants.[1]

31.     On April 3, 2024, all three defendants arrived at the MPD station together to collect their property. Accompanying the defendants was Individual 1, the owner of the red SUV used in the drive-by shooting, and the person who did not allow police officers to process her vehicle for evidence. During a conversation with Officer Garcia, Individual 1 gave Officer Garcia her name and phone number, stated that she was **LOVER**'s girlfriend, and that she should be the police contact for all three defendants. MPD released the defendants' property to them but did not release the SUV to Individual 1.

32.     On April 4, 2024, officers canvassed the defendants' flight path through the woods a second time and recovered blue surgical gloves and a white baseball cap with the word "Nike" in black lettering.

---

[1] Based on the transcript from the defendants' presentment, it is unclear whether the Court received the filed Supplemental Gerstein, which contained some of the additional facts described herein.



*Figure 12: The yellow box represents the __approximate__ area where Mullins, Warfield, and Lover were detained, as well as where the Glock 19 was recovered. The red box reflects the __approximate__ area where the white cap and Draco rifle were recovered.*

33.     The white cap is consistent with the white baseball cap that **LOVER** is seen wearing in the CCTV footage of the drive-by shooting. *See* Figures 13 and 14.



*Figures 13 and 14: Lover Wearing White Baseball Cap.*



*Figure 15: Baseball Cap Recovered from the Woods Where Lover Was Arrested.*

34.     On April 29, 2024, **LOVER** was arrested and had his initial appearance the next

day.

### LOVER'S TIES TO THE TARGET PHONE NUMBER

35.     During a search incident to an arrest, Officer Morris Lovelace recovered a Black

Apple iPhone SE (2nd Gen) (Model: A2275, IMEI: 356852110762576) from **LOVER**'s front left

coat pocket. *See* Figure 16.

24



***Figure 16: Black Apple iPhone SE Retrieved from Lover's Coat Pocket.***

36.     On April 29, 2024, the government sent a subpoena to **PROVIDER**, asking for the subscriber information for the cell phone recovered from Lover's coat pocket.

37.     On April 15, 2024, the **PROVIDER** provided subscriber information to the government that stated that the phone number of the Apple iPhone retrieved from Lover's pocket on April 2, 2024 at approximately 11:36 PM was (202) 961-0234, the **TARGET PHONE NUMBER**.

38.     Based on the above stated facts, your affiant believes the **TARGET PHONE NUMBER** was used by **LOVER** on April 2, 2024.

<u>**BACKGROUND CONCERNING PROVIDER'S ACCOUNTS**</u>

39.     **PROVIDER** is the provider of the cell services for the **TARGET PHONE NUMBER.**

40.     **PROVIDER** is a company that provides cellular telephone access to the general public. As part of the provision of such access, **PROVIDER** gives its users a cell phone number, voice mail, cell service-based text messaging, SMS messaging, the ability to share pictures and video, and cell service based access to the internet. As part of its regular business practices, **PROVIDER** stores information about the use of these services and their contents for varying periods of time depending on the service.

41.     Wireless providers such as **PROVIDER** can provide cell service to more than one phone as part of a package, so that the **TARGET PHONE NUMBER** may be associated with other phones that are paid for by the same subscriber. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular **PROVIDER** account and/or who may have conspired with the user of a particular **PROVIDER** account.

42.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including Media Access Control address ("MAC" address), an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that cell service providers like **PROVIDER** retain records of the unique identifiers of their subscribers' cell phones and other devices.

43.     Based on my training and experience, I know that subscribers can communicate directly with **PROVIDER** about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as **PROVIDER** typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

44.     Wireless providers such as **PROVIDER** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.

45.     Wireless providers such as **PROVIDER** typically collect and retain information in their normal course of business about their subscribers' use of **PROVIDER**'s services, including records about calls, text messages, SMS messages, pictures and video or other communications sent or received by a particular device, such as the source and destination telephone numbers ("call detail records"), email addresses, and IP addresses, and other transactional records. These records may include the contents of such communications. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET PHONE NUMBER's** user or users and who they communicated with and when.

46.     Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider typically stores: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as **PROVIDER** typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

47.     I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers may be a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

48.     Based on my training and experience, I know that **PROVIDER** also collects Per-Call Measurement Data ("PCMD"). PCMD estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data. This location information is variously known as "NELOS" (AT&T), "TrueCall" and "Time on Tower Report" (T-Mobile), "Timing Delay/Timing Advance"

(T-Mobile & Sprint), and/or "Real Time Tool" (RTT) (Verizon) data. Given the limits of the antenna compared to cell towers, this information is likely to be even less reliable than it is when collected by traditional cell towers. AT&T's NELOS information can provide an approximate location of the cellular device using a combination of timing advance, Wi-Fi, and global positioning information (GPS). At times, this information can supplement cell site data when no call or text information is available.

49.     In summary, based on my training and experience in this context, I believe that the computers of **PROVIDER** are likely to contain user-generated content such as stored electronic communications, as well as **PROVIDER**-generated information about its subscribers and their location and use of **PROVIDER** services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide **PROVIDER** with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

50.     As explained above, information stored in connection with a **PROVIDER** account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a **PROVIDER** account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, text messages, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further,

information maintained by **PROVIDER** can show how and when the account was accessed or used. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the **PROVIDER** account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[2]

51.    Based on my training and experience, I know that evidence of who controlled, used, and/or created a **PROVIDER** account may be found within the user-generated content created or stored by the **PROVIDER** subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That

---

[2] At times, internet services providers such as **PROVIDER** can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of **PROVIDER**'s services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because phones and similar **PROVIDER** accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

52.     In my knowledge, training, and experience, I know that criminals sometimes use "burner" phones, or cheap disposable prepaid mobile phones when preparing for and committing their crimes. "Burner" phones are mobile phones for which credit is purchased in advance of service use. Burner phones can be bought with cash and with no contract, plus providers that sell these devices often don't track personal data. Burner phones often use a mobile virtual network operator that has agreements with companies like **PROVIDER** to access cell service, therefore, burner phone records may be included in the information stored by **PROVIDER**.

53.     In my knowledge, training, and experience, I have learned that it is often beneficial to review at least 60 days of cell phone records on either side of a criminal event because they will establish a pattern of life and behavior. A smaller collection of records would make it difficult to determine if it is unusual for the phone(s) to appear in the areas where these crime(s) occurred. Not only will this assist in determining if the phone(s) frequents the areas of the crime scene(s), but also whether the phone normally belongs in these areas because that is where the phone subscriber lives and/or works.

## AUTHORIZATION REQUEST

76.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

77.     I further request that the Court direct **PROVIDER** to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on **PROVIDER**, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## **CONCLUSION**

78.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of the **TARGET OFFENSES** may be located with the records and information associated with the **TARGET PHONE NUMBER** described in Attachment A. Therefore, I request that the Court issue the proposed search warrant to seize items described in Attachment B.

Respectfully submitted,

_____
Detective Thomas Jones
Metropolitan Police Department

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 11, 2024.

_____
HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by U.S. Cellular, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of U.S. Cellular, and they were made by U.S. Cellular as a regular practice; and

b.      such records were generated by U.S. Cellular's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of U.S. Cellular, in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by U.S. Cellular, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                   Signature

33